# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

## CIVIL NO. 1:04CV265

| | | |
|---|---|---|
| **JIMMY DAWSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **U.S. TEXTILE CORP., a North** | ) | |
| **Carolina Corporation; and** | ) | |
| **CONSOLIDATED WORK** | ) | |
| **INDUSTRIES, INC., a North** | ) | |
| **Carolina Corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THIS MATTER** is before the Court on the Plaintiff's timely filed

objections to the Memorandum and Recommendation of United States

Magistrate Judge Dennis L. Howell.  Pursuant to standing orders of

designation and 28 U.S.C. § 636, the undersigned referred the Defendants'

motion for summary judgment to the Magistrate Judge for a

recommendation as to disposition.  Having conducted a *de novo* review to

those portions of the recommendation to which specific objections were

filed, the recommendation is adopted and the Defendants' motion is granted.  **28 U.S.C. § 636(b); Fed. R. Civ. P. 72.**

## I.  STANDARD OF REVIEW

A district court conducts a *de novo* review of those portions of a memorandum and recommendation to which specific objections are filed.  **28 U.S.C. § 363(b).**  Where no objection is made, the court need "'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" ***Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 Advisory Committee Note).**

"'Parties filing objections must specifically identify those findings objected to.  Frivolous, conclusive or general objections need not be considered by the district court.'" ***Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982)).**  "A general objection to the entirety of the magistrate's report has the same effects as would a failure to object.  The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless." ***Howard v.***

***Sec'y of HHS*, 932 F.2d 505, 509 (6th Cir. 1991).**  Boilerplate objections without any citation to case law or the record do not warrant *de novo* review.  ***Wells v. Shriners Hosp.*, 109 F.3d 198, 200 (4th Cir. 1997).**  "In this Circuit, *de novo* review is unnecessary 'when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations.'"  ***Hyatt v. Town of Lake Lure*, 314 F.Supp.2d 562, 580 (W.D.N.C. 2003), *aff'd*, 114 Fed. Appx. 72 (4th Cir. 2004) (quoting *Orpiano v. Johnson*, 687 F.2d 44, 48 (4th Cir. 1982)); *see also, Lockert v. Faulkner*, 843 F.2d 1015, 1019 (7th Cir. 1988).**

## II.  PLAINTIFF'S OBJECTIONS

Here, the Plaintiff's attorney has filed objections "to Section IV" of the Memorandum and Recommendation and to a recommendation that his motion to compel be denied.  **Plaintiff's Objections to Second Memorandum and Recommendation, filed December 19, 2005, at 1.** Plaintiff's objections  state, in part, that "[t]he Court's attention is invited to the motion which was filed on October 11, 2005, requesting the Court to conduct a *de novo* review of this motion."  ***Id.***

Counsel also "objects to Section V" of the Memorandum and Recommendation and to the recommendation that summary judgment be granted in the Defendants' favor. *Id.*, at 2. "[T]he plaintiff objects to the foregoing to the extent that it constitutes conclusions of law and recommendations and requests this Court to conduct a *de novo* consideration of the defendants' Motion for Summary Judgment and hereby adopts the Plaintiff's Response to the Summary Judgment Motion[.]" *Id.*

These comments are nothing more than general objections to the Memorandum and Recommendation and request the undersigned, in essence, to completely discard the Magistrate Judge's opinion and conduct a *de novo* review. This is not required absent specific objections pointing this Court to those portions of the Memorandum and Recommendation to which error has been assigned by the Plaintiff. This Court does not, and will not, simply ignore the Magistrate Judge's opinion and consider the motion anew.

There are four objections raised by the Plaintiff which do not fall within the general category; neither are they specific objections, because Plaintiff has failed to cite to the record or include case law in support of his

position. Boilerplate objections without any citation to case law or the record do not warrant *de novo* review. ***Wells, supra.*** Those objections are as follows: (1) that George Charles, another inmate-employee, heard supervisors use racial slurs; (2) that the Magistrate Judge failed to consider the fact that the Plaintiff complained to his supervisors about his work environment but they failed to take appropriate action; (3) that white workers received favorable treatment; and (4) that Plaintiff was not required to have included in his charge to the Equal Employment Opportunity Commission (EEOC) every incident which he has now alleged in his complaint. These objections will be considered briefly but do not warrant *de novo* review in the absence of any citation to the record or supporting case law.

## III. FACTUAL BACKGROUND

It is undisputed that the Plaintiff's claims arise from his employment during his incarceration at Mountain View Correctional Facility in Avery County, North Carolina, while he was in the custody of the North Carolina Department of Corrections (DOC). That facility participates in the Prison Industry Enhancement Program (PIE), the program in which the Plaintiff

participated.  At Mountain View, the PIE program manufactures hosiery in a facility located within the prison itself.  The Plaintiff was a machine operator in the facility beginning his employment in 2001 and ending in 2004.  Defendant Consolidated Work Industries (CWI) provides the accounting and payroll functions for the facility and operates under a verbal agreement with Defendant U. S. Textile Corp. which actually runs the operation and provides supervisors for the inmate workers.  The DOC has a policy that no inmate may participate in the PIE program for longer than three years.  It also has a statewide grievance procedure for employees and inmate-employees who participate in any PIE program.  Those programs were in place and enforced at Mountain View during the time the Plaintiff was employed as an inmate-employee.

In November 2003, the Plaintiff took advantage of the procedures and filed a grievance alleging that Keith Gardner, a fellow inmate-employee, used a racial slur toward him, *i.e.*, the word "nigger."  In response to this grievance, the Plaintiff's supervisor, Judy Grubb, conducted an investigation which included interviews and written statements of other inmate-employees regarding the incident.  Every inmate-employee in the immediate area provided statements that they did

not hear any such slur. Grubb averred that on the day of the alleged incident, the Plaintiff asked if he could leave work early due to a headache and personal problems. He did not mention any incident with Gardner. The grievance was investigated to completion in accordance with the DOC Administrative Remedy Procedure and the Inmate Grievance Examiner found it unsubstantiated and dismissed the grievance. The Plaintiff claims that Grubb told him that the event of which he complained occurred all the time and he would just have to become accustomed to it.

At some point during 2001, the Plaintiff was shown a noose by a white inmate-employee, Chad Buchanan. Buchanan told the Plaintiff that Paul Thomas, a white "civilian[1]" employee, had left the noose at Buchanan's work station to intimidate Buchanan. Buchanan had delivered a greeting card made by a Mexican inmate for Sarah Gardner, a white civilian employee. Sarah was dating Paul Thomas at the time and, although not clear, it appears that Thomas was irate with Buchanan for delivering the card to his girlfriend. The noose was a threat to Buchanan. While the Plaintiff found it offensive to have a noose in the workplace, he

---

[1]The employees of the facility who were not inmates were referred to as "civilians."

did not feel it was a threat to him or in any manner directed toward him.  It was, in fact, an act performed by one white worker against another white worker.  Buchanan reported the incident to Judy Grubb.

On another occasion in 2001, the Plaintiff saw another noose hanging from the ceiling over the break table in the facility about 15 feet from his workstation.  It was commonly believed that Paul Thomas also was responsible for that noose.  The Plaintiff found the noose offensive due to his race and the history of oppression against his race.  Nonetheless, the Plaintiff did not believe the presence of the noose was directed toward him.  In fact, the Plaintiff specifically testified that the noose was not directed toward him personally and was not intended to send a personal message to him.

At some time prior to November 2003, the Plaintiff considered himself to be friends with Keith Gardner.  Gardner asked the Plaintiff to look at a machine with him and said to the Plaintiff, "If I said something, would you get offended?"  At that point, Gardner referred to the broken machine as having been "nigger rigged."  The Plaintiff testified that this was offensive to him.  However, he also testified that he did not include this incident in his EEOC charge.

The Plaintiff also testified that with the exception of the incidents involving Gardner, he did not hear other employees use that term. He did admit that he had, himself, used the word "nigger" when in the company of other African Americans.

Between 2001 and 2004, the Plaintiff requested several times to be transferred to a job which would not be as physically demanding. He could not recall the specific dates on which he made such requests and he did not make the requests in writing. The Plaintiff testified that Grubb told him she did not have jobs available in the areas to which he sought to transfer. She also advised him that if he was unable to work, he could leave the job and she would bring him back to work if an opening in the area he preferred became available. Grubb averred that many inmate-employees made similar requests; by January 2003, the requests for transfer had become so numerous that it was causing disruption within the work place. As a result, she established an internal policy to reduce the number of job transfers and limited transfers to those supported by DOC medical staff recommendations that an inmate's medical condition required specific accommodations. The Plaintiff did not provide Grubb with any documentation from the DOC medical staff in support of his request for

transfer. Nonetheless, he feels that white inmate-employees were transferred for medical reasons when he was not. Only one such individual was identified by the Plaintiff although the time period was not provided. Nor did the Plaintiff allege that those employees were transferred without providing DOC medical documentation to support their requests for transfer.[2]

The Plaintiff also believes that white inmate-employees were promoted when he should have received a promotion. Again, he could not recall dates when he requested promotions or the dates the white employees were promoted. The Plaintiff also alleged variously that after four years his employment was terminated after he filed an EEOC charge; that his employment was terminated because he had been working longer than three years; and that his employment was terminated because the facility did not have enough work and a group of 15 or more inmate-employees was laid off. Grubb has averred that the Plaintiff had been working longer than the three years allowed under the PIE program and

---

[2]George Charles, an inmate-employee, testified that the Plaintiff told him about requests to be transferred. Charles' information was based solely on what the Plaintiff had told him, thus, it was hearsay evidence.

this resulted in his termination. No specific objection to the Magistrate Judge's finding on this issue was made.

In his objections, the Plaintiff claims that the testimony of George Charles supports his claims. Charles actually testified, however, that he had never heard Keith Gardner make racially derogatory comments in front of African Americans. **Deposition of George Charles, *attached to Plaintiff's Response to Defendants' Motion for Summary Judgment, filed October 11, 2005, at 47-48.*** He then testified, however, that Gardner had a bad temper and would "just explode" and say "damn niggers." ***Id.*, at 51-52.** Nonetheless, the Plaintiff testified that with the exception of Gardner's use of a racial slur on two occasions, he did not hear Gardner or any other person in the workplace do so.

## IV. DISCUSSION

Inmates do not have a right to any particular job assignment, or indeed to any job assignment, during their incarceration. ***James v. Quinlan*, 866 F.2d 627, 630 (3d Cir. 1989).** Nonetheless, if a prison system makes such opportunities available, it may not discriminate against an inmate on the basis of race. ***Cruz v. Beto*, 405 U.S. 319 (1972).** A

hostile work environment falls within the parameters of conduct prohibited by Title VII.  ***Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002).**

Here, Plaintiff claims that the use of racial epithets in the workplace, the failure of management to correct that behavior, and favorable transfers of white inmate-employees amounted to a hostile work environment.

> To demonstrate a racially-hostile work environment, [the Plaintiff] must show that he was the subject of conduct that was (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer.

***Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4ᵗʰ Cir. 2004) (citations omitted).**

> There can be no doubt federal harassment standards are demanding.  Indeed, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."  The Supreme Court also has made it abundantly clear that the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Title VII is violated only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" We can determine "whether an environment is 'hostile' or 'abusive' . . . only by looking at all the circumstances[, which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment. . . . The Court often has made the point that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" The Court implores lower courts to apply the demanding harassment standards to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes and occasional teasing.'" [The undersigned] conclude[s] the [Magistrate Judge] appropriately [recommended dismissal of the Plaintiff's] hostile work environment claims because his workplace at the [prison] was not permeated with severe or pervasive harassment sufficient to alter the terms, conditions or privileges of employment. [Plaintiff] produced only a few comments . . . allegedly made over a [period of years]. Most of these offhand and isolated comments were wholly unrelated to each other and had a tenuous connection to race[.] [Gardner's] comments were infrequent, were not severe, never physically threatened [the Plaintiff], were more akin to mere offensive utterances, and did not interfere with [his] work performance. . . . [Plaintiff's] evidence falls far short of the Supreme Court's demanding harassment standards.

**Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038-39 (8th Cir. 2005)**

**(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998);**

**Harris v. Forklift Sys. Inc., 510 U.S. 17, 21, 23 (1993) (quoting Meritor**

**Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)); and Oncale v.**

**Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998)) (other**

**internal citations omitted) (involved the employment of an inmate in a**

**prison facility by a private manufacturing company within the prison who complained that his supervisor ridiculed his English, his religion and his customs).** Assuming without deciding that Gardner used the phrases "nigger rigger" and "damn nigger" on two occasions a year apart, the result does not change.

> "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Of course, whether [Gardner's] slur was highly offensive, unwelcome, and racially motivated is not the issue – clearly, it was. Rather, the question is whether the use of racial epithets and abusive language so pervaded the work environment at the [facility] that it was essentially transformed into an atmosphere tinged with racial hostility and altered the conditions of [Plaintiff's] employment. "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."

*Shields v. Federal Express Corp.*, **120 Fed. Appx. 956, 961 (4th Cir. 2005) (quoting** *Spriggs v. Diamond Auto Glass*, **242 F.3d 179, 185 (4th Cir. 2001) and** *Feingold v. New York*, **366 F.3d 138, 150 (2d Cir. 2004));** *accord, Chacko v. Patuxent Inst.*, **429 F.3d 505, 512 n.3 (4th Cir. 2005) ("Hostile [work] environment claims are different in kind from discrete acts." (quotation omitted));** *Lissau v. Southern Food Serv*., **159 F.3d 177, 183 (4th Cir. 1998) ("Title VII does not provide a remedy**

**for every instance of verbal or physical harassment in the**

**workplace.").**

The Magistrate Judge found that the Plaintiff's claims for disparate

treatment in the terms of employment by virtue of failure to transfer or

promote were barred because he failed to include these claims in his

charge before the EEOC.  Plaintiff objects, claiming he is not required to

allege every incident in the EEOC charge.

> "Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies by filing a charge with the EEOC."  The exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible.  While "[t]he EEOC charge defines the scope of the plaintiff's right to institute a civil suit," "[a]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination."  In other words, "[i]f a plaintiff's claims in [his] judicial complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in [his] subsequent civil suit."

*Miles v. Dell, Inc.*, **429 F.3d 480, 491 (4ᵗʰ Cir. 2005) (quoting *Bryant v.**

**Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132 (4ᵗʰ Cir. 2002) and *Smith**

**v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4ᵗʰ Cir. 2000)) (other**

**citations omitted).**  Here, the Plaintiff alleged (1) nooses were found

hanging at various sites in the workplace; (2) he was called a "damn nigger" by his supervisor; (3) his supervisor did nothing about it; and (4) he was told to get used to such treatment.  Plaintiff did not claim he was retaliated against for complaining about the work environment and did not claim that he had not been promoted or transferred.  *Id.* **(plaintiff failed to check the appropriate boxes on the EEOC charge form).**  Defendants here would not have been put on notice that they might have to answer to such allegations.  *Id.*  Nor would the EEOC have been alerted to the fact that an investigation into such incidents was necessary.  *Id.*  The Court, therefore, finds that the Plaintiff failed to exhaust his administrative remedies as to these claims.[3]  *Id.***; *accord, Bryant, supra.***

## V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion to dismiss is hereby **GRANTED.**  A Judgment dismissing this action is filed herewith.

---

[3]Nor could any letters written to the EEOC by the Plaintiff after the formal charge amend the same.  ***Miles, supra.***

**Signed: January 20, 2006**

Lacy H. Thornburg
United States District Judge